IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–01538–EWN

BRENDA S. WEBB,

Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

Defendant.

---

**ORDER AND MEMORANDUM OF DECISION**

---

This is a social security benefits appeal. Plaintiff Brenda S. Webb challenges the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability benefits under Title II of the Social Security Act. *See* 42 U.S.C. §§ 406–33 (2006). Jurisdiction is premised upon 42 U.S.C. § 405(g) (2006).

**FACTS**

***1. Medical Evidence***

Plaintiff was born on June 19, 1961 and was thirty-five years old at the onset of her alleged disability. (Admin. R. at 56 [filed Oct. 16, 2006] [hereinafter "Admin. R."].) Plaintiff completed two years of college, and worked in the vocationally relevant past as a trucker, veterinary assistant, and retail clerk. (*Id*. at 31, 65–66) Plaintiff alleges that she became unable to

work beginning on December 31, 1996 due to psoriatic arthritis, rheumatoid arthritis, depression, bipolar disorder, blindness in the left eye, "bleeding heart tricuspus [sic]," anxiety, and psoriasis. (*Id.* at 31.) Plaintiff was last insured for disability benefits through March 31, 2001. (*Id.* at 59.) Thus, Plaintiff must prove she was totally disabled prior to that date. *Henrie v. Dep't of Health & Human Servs.*, 13 F.3d 359, 360 (10th Cir. 1993).

***a. Medical History Preceding Date Last Insured***

***(1) Hepatitis C***

On September 8, 1997, Plaintiff saw gastroenterologist Richard D. Folan, M.D. for an evaluation of her hepatitis C, which Plaintiff acquired through the use of intravenous drugs. (Admin. R. at 136–37.) Dr. Folan assessed chronic hepatitis C with early changes toward cirrhosis. (*Id.* at 137.) After a series of tests and consultations, on January 11, 1999, Dr. Folan began Plaintiff on a year-long interferon treatment.[1] (*Id.* at 132–35.) Other than one-time complaints of irritability, "confusion and nightmares," and weariness, Plaintiff tolerated the treatment without significant side effects. (*See id.* at 120–31.)

On April 27, 2000, Plaintiff returned to Dr. Folan for a check-up. (*Id.* at 121.) Plaintiff reported she was "feeling great and energetic and [wa]s having no problems." (*Id.*) Dr. Folan opined that Plaintiff was a "[c]omplete responder" to the therapy. (*Id.*)

---

[1]Interferon "prevents reproduction of the virus and produces in other cells a state of resistance toward further infection with viruses." J.E. SCHMIDT, M.D., 3–I ATTORNEYS' DICTIONARY OF MEDICINE 2898 (Matthew Bender 2005) (hereinafter "ADM").

On July 17, 2000, Plaintiff returned to Dr. Folan for a six-month follow-up appointment. (*Id.* at 120.) Dr. Folan noted Plaintiff "is now considered a complete virologic responder, and at six months this is considered a cure. Her liver function tests have remained normal." (*Id.*) Dr. Folan noted that he did not need to follow up with Plaintiff. (*Id.*)

***(2) Arthritis***

On May 2, 1996, Plaintiff saw Austin J. Corbett, M.D. with regard to swelling of the right knee and joint pain. (*Id.* at 505–07.) Treatment notes reveal that Plaintiff had a history of psoriasis and psoriatic arthritis.[2] (*Id.* at 506.) Plaintiff complained of gradual worsening of joint pain over the last year. (*Id.*) Dr. Corbett (1) diagnosed psoriasis with probable psoriatic arthritis, (2) prescribed methotrexate, and (3) administered an injection in Plaintiff's right knee.[3] (*Id.* at 505.)

Treatment notes from May 31, 1996, July 11, 1996, and August 22, 1996 reveal consistent improvement in Plaintiff's symptoms. (*Id.* at 504.) On October 3, 1996, Plaintiff returned to Dr. Corbett, who noted she was "essentially without complaints." (*Id.* at 503.)

---

[2]Psoriasis is a "chronic skin disease marked by the development of red patches on various parts of the body, as on the elbows, back, scalp, the hairy side of the limbs, etc. The patches are usually covered with a silvery, white scale. The cause of the disease is unknown and the treatment is unsatisfactory." 5–PR ADM 2214. Psoriatic arthritis is "[a]rthritis associated with psoriasis . . . . The inflammatory process affects the joint between the middle segment of the finger and the terminal segment, a condition which is regarded as diagnostic of this disease." *Id.* at 2217.

[3]Methotrexate is "used to diminish or check the immunological response of the body." 4–M ADM 3708.

On January 3, 1997, Plaintiff reported to Dr. Corbett a flare-up of pain and an overlying rash in her feet, which had subsided. (*Id.* at 503.) Plaintiff also complained of "easy fatiguability," which the doctor attributed to her being "overweight and de-conditioned." (*Id.*)

On July 2, 1997, Plaintiff again returned to Dr. Corbett, noting she was "doing quite well" and had lost about fourteen pounds. (*Id.* at 501.) However, because Plaintiff's psoriasis, hip pain, and shoulder pain had worsened somewhat, Dr. Corbett increased Plaintiff's dose of methotrexate. (*Id.*) Dr. Corbett scheduled a liver biopsy to determine if the drug was causing damage. (*Id.*) On July 25, 1997, Plaintiff returned to Dr. Corbett, who switched her from methotrexate to another arthritis medicine, apparently based on the biopsy's results. (*Id.*)

On September 10, 1997, Plaintiff returned to Dr. Corbett, complaining of pain in her right hip and knee. (*Id.* at 502.) Dr. Corbett noted hip injections had been only "transiently helpful" and referred Plaintiff to a physical therapist for strengthening exercises. (*Id.*)

On December 2, 1997, Plaintiff complained to Dr. Corbett of shoulder pain over the past few months, but noted that her knee pain was better and her hip pain came and went. (*Id.*) Dr. Corbett administered an injection in Plaintiff's shoulder. (*Id.*) On December 22, 1997, Dr. Corbett noted the injection had helped, but Plaintiff still complained of intermittent pain. (*Id.*)

On January 29, 1998, Plaintiff returned to Dr. Corbett, who noted her "only complaint [was] of aching in the left shoulder which c[ame] and [went] but [was] generally well controlled as long as she t[ook] regular Motrin." (*Id.* at 500.)

On February 26, 1998, Plaintiff complained of generally worsening joint pain, particularly in her right shoulder. (*Id.*) Dr. Corbett administered a trigger-point injection. (*Id.*)

On April 9, 1998, Plaintiff complained of increasing knee, elbow, and shoulder pain.  (*Id.* at 499.)  Dr. Corbett changed Plaintiff's arthritis medication.  (*Id.*)  On May 12, 1998, Plaintiff reported to Dr. Corbett "a gradual, but significant improvement" with the new medication.  (*Id.*)

On June 11, 1998, Plaintiff returned to Dr. Corbett with left shoulder and right knee pain. (*Id.* at 498.)  Dr. Corbett: (1) found Plaintiff's left shoulder "exhibit[ed] full active and passive range of motion;" (2) advised Plaintiff to do strengthening exercises for her knee and shoulder; and (3) administered an injection for psoriasis.  (*Id.*)

On July 19, 1998, Plaintiff returned to Dr. Corbett, complaining that her left shoulder pain was only transiently helped by injections.  (*Id.*)  Dr. Corbett noted she had a good response to last visit's injection.  (*Id.*)

On August 20, 1998, Plaintiff again complained of shoulder pain to Dr. Corbett, who referred Plaintiff to physical therapy for shoulder exercises and prescribed different arthritis medications.  (*Id.* at 497.)  On September 30, 1998, Plaintiff returned to Dr. Corbett, reporting she was doing well on the new medications and had "marked improvement in her shoulder pain with physical therapy and exercise."  (*Id.*)

On January 11, 1999, Plaintiff returned to Dr. Corbett, complaining of morning stiffness in her hands and feet, as well as some pain and grinding in her right knee.  (*Id.*)  Dr. Corbett continued Plaintiff's medicines.  (*Id.*)

On March 17, 2000, Plaintiff returned to Dr. Corbett, complaining of joint pain and morning stiffness.  (*Id.* at 495.)  Dr. Corbett changed one of Plaintiff's arthritis medications.  (*Id.*)

On June 8, 2000, Plaintiff returned to Dr. Corbett, indicating that she was "feeling very well [and was] spending a lot of time outside in the sun." (*Id.* at 494.)  Plaintiff's psoriasis was waning, but the morning stiffness in her joints persisted.  (*Id.*)  Dr. Corbett's notes suggest that Plaintiff's ongoing interferon treatment limited the types of arthritis medications he could prescribe for her.  (*Id.*)

On July 26, 2000, Dr. Corbett noted Plaintiff's complaints of increasing joint pain and swelling, especially in the right knee.  (*Id.* at 493.)  Plaintiff also exhibited worsening psoriasis on her hands.  (*Id.*)  Due to Plaintiff's recent normal liver panel, which reflected that Plaintiff was "cured" of hepatitis C, Dr. Corbett added a number of new arthritis medications.  (*Id.*)

On August 29, 2000, Plaintiff returned to Dr. Corbett, who noted she was "having problems with depression [and] was frequently tearful throughout the interview." (*Id.*)  Dr. Corbett prescribed Zoloft and increased one of Plaintiff's arthritis medications.  (*Id.*)  Dr. Corbett further noted: Plaintiff "ha[d] been taken off Synthroid recently to determine her need.  Since then, she has been complaining of fatigue, increasing moodiness, and weight gain.  I advised her that she may need to restart her thyroid supplement." (*Id.*)  On October 9, 2000, Plaintiff returned to Dr. Corbett and was "doing much better, having restarted thyroid [supplement] with resolution of her mood swings." (*Id.* at 492.)

On January 9, 2001, Plaintiff returned to Dr. Corbett, noting she was still doing quite well.  (*Id.* at 491.)  Although Plaintiff's psoriasis was worsening, her joint symptoms remained "fairly well-controlled." (*Id.*)

On February 20, 2001, Plaintiff again saw Dr. Corbett, complaining of severe pain in her right knee. (*Id.*) X-rays revealed degenerative spurring in the knee joint. (*Id.*) However, Dr. Corbett observed Plaintiff's arthritis to be "well-controlled." (*Id.*) Dr. Corbett administered an injection in Plaintiff's right knee, to be repeated three times over the next month. (*Id.*)

On March 29, 2001, Plaintiff visited Dr. Corbett for the fourth knee injection. (*Id.* at 490.) Dr. Corbett assessed: "[t]he right knee pain is markedly better with [ninety percent] improvement." (*Id.*)

***(3) Blindness***

April 16, 1997 eye examination notes from Michael W. Coatney D.O. reveal that Plaintiff had severely impaired vision in her left eye due to having been stabbed in the eye with a stick as a child. (*Id.* at 240.) Vision in her right eye was 20/20. (*Id.*)

On April 18, 2002, Dr. Coatney wrote a letter stating Plaintiff had 20/40 distance vision and 20/20 near vision in her right eye. (*Id.* at 243.) Dr. Coatney prescribed glasses for night driving, which brought Plaintiff's right distance vision to 20/20. (*Id.*)

***(4) Psoriasis***

On March 20, 1996, Plaintiff visited Kim K. Dernovsek, M.D. for treatment for psoriasis. (*Id.* at 257.) Dr. Dernovsek observed outbreaks on Plaintiff's forearm and palms, but found that she had a good range of motion and flexibility of the fingers. (*Id.*) Dr. Dernovsek continued treatment with various creams and ointments. (*Id.*)

On January 13, 1997, Plaintiff returned to Dr. Dernovsek, who observed "extreme xerosis of the palms bilaterally."[4] (*Id.* at 256.) Dr. Dernovsek noted that Plaintiff's psoriasis was "adequately controlled" by medication. (*Id.*)

Dr. Dernovsek's February 2, 1998 treatment notes revealed generally light psoriasis. (*Id.* at 255.) Plaintiff had quit using most of her medications, so Dr. Dernovsek gave her new prescriptions and urged their use. (*Id.*) August 7, 1998 and November 10, 1998 treatment notes reveal Plaintiff's psoriasis was "under control due to steroid injections." (*Id.* at 254.) With the exception of some increased dryness of the skin, Plaintiff's condition remained stable and "under control" from October 1998 through a visit in February 2001. (*Id.* at 250–54.)

***b. Post-Insurance Medical History***

Plaintiff continued to see Dr. Corbett through June 2005. (*Id.* at 479–90, 674–76.) In August 2005, Dr. Corbett completed a functional capacity assessment of Plaintiff's ability to do work-related activities. (*Id.* at 670–73.) Dr. Corbett indicated that Plaintiff could: (1) occasionally lift ten pounds; (2) frequently lift less than ten pounds; (3) occasionally climb or balance; (4) never kneel, crouch, crawl, or stoop; and (5) stand less than two hours in an eight-hour work day. (*Id.* at 670–72.) Dr. Corbett further indicated Plaintiff had: (1) no sitting limitations; (2) limited pushing and pulling abilities; (3) limited ability to reach, handle, finger, or feel; and (4) no visual, communicative, or environmental limitations. (*Id.* at 671–73.)

---

[4]Xerosis is a "condition of abnormal dryness of the skin." 6–X ADM 167.

The record includes a letter from Plaintiff's counsel to Dr. Corbett, in which the following question is asked: "Please answer the following question 'yes' or 'no.' Did the limitations indicated in the [functional capacity assessment] provided by you exist prior to 03/31/01?" (*Id.* at 689.) Dr. Corbett stated that his assessment applied from March 17, 2000 forward. (*Id.*)

One other statement in the post-expiration record is relevant. November 23, 2002 treatment records from John T. Hardy, M.D. reveal Plaintiff stated that she was fired from her most recent job "for being a woman." (*Id.* at 434.)

***2. Procedural History***

On August 20, 2004, Plaintiff filed an application for disability insurance benefits. (*Id.* at 56.) On December 2, 2004, the Social Security Administration denied Plaintiff's application. (*Id.* at 42.) On January 3, 2005, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 49.) On September 23, 2005, the ALJ held a hearing, at which Plaintiff testified, represented by an attorney. (*Id.* at 30–40.)

Plaintiff testified that she had graduated from high school and had two years of college education. (*Id.* at 31.) Plaintiff asserted that prior to leaving employment in 1995, she worked as a water truck driver. (*Id.* at 33–34.) Plaintiff stated that, as a water truck driver, she had to drag a two-hundred pound hose, but that she spent most of the day seated in her truck. (*Id.* at 34.) Plaintiff indicated that as of December 31, 1996, she suffered swelling in her knees, ankles, and hips, as well as stiffness that prevented her from getting in and out of her truck. (*Id.* at 35.) Plaintiff testified that her psoriatic arthritis "cause[d] [her] hands or joints to break out enough where they're just nothing but cracked and bleeding." (*Id.*) Plaintiff represented that she had her

joints drained by Dr. Corbett every day at the time of her onset.  (*Id.*)  Plaintiff further stated that

when she was on interferon — for a period of two years — she would listlessly travel back and

forth "from the couch to the bed."  (*Id.* at 37–38.)

Plaintiff testified that she did not apply for social security until 2004 because she "kept

hoping that [she] could go back to work."  (*Id.* at 38.)  However, she indicated that her fatigue

and soreness prevented her from doing work around the house.  (*Id.*)

On November 23, 2005, the ALJ issued a decision, finding that Plaintiff was not disabled

at any time on or before March 31, 2001, the date last insured.  (*Id.* at 15–23.)  In reaching his

conclusion, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since

December 31, 1996.  (*Id.* at 16.)  The ALJ determined that Plaintiff's blindness in the left eye and

heart problems were not severe impairments.  (*Id.* at 20.)  With respect to Plaintiff's mental

impairments, the ALJ noted that while Plaintiff had been treated recently for mental problems, her

treating source, Dr. Hardy, stated that such problems did not manifest until October 2004.  (*Id.*)

The ALJ next determined that Plaintiff's arthritis and psoriasis constituted severe impairments,

which did not meet or equal any of the listed impairments in Appendix 1, Subpart P, Regulations

Number 4.  (*Id.* at 16–19, 22.)

The ALJ rejected Dr. Corbett's functional capacity assessment because it was "not

supported by the treatment records or the objective findings for the period on or prior to the date

last insured."  (*Id.* at 19.)  The ALJ also discounted the assessment because it was made over four

and one-half years after the date last insured.  (*Id.*)  The ALJ pointed out that the evidence

suggested Plaintiff's conditions had responded well to treatment during the relevant time period,

although they worsened somewhat when Plaintiff stopped taking methotrexate during her interferon treatment.  (*Id.*)

The ALJ found Plaintiff's subjective complaints for the period on or prior to March 31, 2001 were "not fully credible," as they were out of proportion with the medical record.  (*Id.* at 21.)  The ALJ further noted that Plaintiff had told Dr. Hardy "she was fired from her long-haul trucking job for being a woman, which indicates that she did not stop working because of her impairments."  (*Id.*)

Next, the ALJ determined that, during the relevant time period, Plaintiff had the residual functional capacity ("RFC") to perform a full range of light work and, thus, was unable to do her past relevant work.  (*Id.*)  Nevertheless, because of her capacity for light work, the ALJ determined Plaintiff was not disabled on and prior to the date last insured.  (*Id.* at 22.)

On December 19, 2005, Plaintiff requested a review of the ALJ's decision.  (*Id.* at 687–88.)  On June 8, 2006, the Appeals Council affirmed the ALJ's decision.  (*Id.* at 6–9.)  On August 7, 2006, Plaintiff filed a complaint in this court challenging the Commissioner's denial of disability benefits.  (Compl. [filed Aug. 7, 2006].)  On May 21, 2007, Plaintiff filed her opening brief.  (Pl.'s Opening Br. [filed May 21, 2007] [hereinafter "Pl.'s Br."].)  On June 21, 2007, the Commissioner filed a response.  (Def.'s Resp. Br. [filed June 21, 2007] [hereinafter "Def.'s Resp."].)  Plaintiff did not file a reply brief.

## ANALYSIS

### *1. Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of the Commissioner's denial of disability insurance benefits. *See* 42 U.S.C. § 1383(c)(3) (2006) (incorporating review provisions of 42 U.S.C. § 405[g]). Section 405(g) provides, in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this section, the court shall review only the question of conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g) (2006). Thus, this court's review is limited to determining whether the record as a whole contains substantial evidence supporting the Commissioner's decision. *See id.*; *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987) (citations omitted). The court must uphold the Commissioner's decision if it is supported by substantial evidence. *See Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987). This court cannot reweigh the evidence nor substitute its judgment for that of the ALJ. *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987). That does not mean, however, that this court's review is merely cursory. To find that the ALJ's decision is supported by

substantial evidence, the record must include sufficient relevant evidence that a reasonable person might deem adequate to support the ultimate conclusion. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also subject to reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

***2. Evaluation of Disability***

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than sixty-five years of age, and is under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006). In proving disability, a claimant must make a *prima facie* showing that she is unable to return to the prior work she has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability-insurance benefits. *See* 20 C.F.R. § 404.1520 (2007); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis). A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded. *See* 20 C.F.R. § 404.1520(a) (2007); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). First, the claimant must demonstrate that she is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b) (2007). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits her physical or mental ability to do basic work activities. *Id.* § 404.1520(c). At the third step, if the impairment matches or is equivalent to established listings, then the claimant is adjudged conclusively disabled. *Id.* § 404.1520(d). If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents her from performing work she has performed in the past. *See Williams*, 844 F.2d at 751 (citations omitted). If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e) (2007); *Williams*, 844 F.2d at 751. The fifth step requires the Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience; and (2) there is availability of that type of work in the national economy. *See* 20 C.F.R. § 404.1520(f) (2007); *Williams*, 844 F.2d at 751. ***3.***

***Disability Determination***

Plaintiff sets forth two arguments in support of her contention that the ALJ's decision is erroneous. (Pl.'s Br. at 5–16.) Plaintiff asserts that the ALJ erred by: (1) omitting Dr. Corbett's

functional capacity assessment from the record and giving "no weight" to Dr. Corbett's opinions; and (2) ignoring Plaintiff's "significant nonexertional limitations" in deciding to rely on the grids. (*Id.*) I consider each argument in turn.

***a. Dr. Corbett's Functional Capacity Opinion***

First, Plaintiff asserts the ALJ erred by not considering Dr. Corbett's assessment of residual functional capacity because the same was omitted from the record. (*Id.* at 5–8.) Second, Plaintiff contends the ALJ erred by giving "no weight" to Dr. Corbett's opinions. (*Id.* at 9–14.) Both arguments are premised of fundamental misunderstandings of the ALJ's opinion. I consider each misguided argument in turn.

***(1) Omission of Evidence***

Plaintiff argues that although she sent Dr. Corbett's functional capacity assessment to the ALJ after the hearing, "the opinion was not . . . considered by the [ALJ]." (*Id.* at 5–6.) Plaintiff is shockingly wrong. The ALJ's opinion *expressly considered* Dr. Corbett's functional capacity assessment. The ALJ stated: "I do not give any weight to the assessment[] from Dr. Corbett (Exhibit 30F/1–4)."[5] (Admin. R. at 19.) The ALJ then proceeded to discuss the assessment at length. (*Id.*) Plaintiff's argument that he did not is baseless.

---

[5]In the administrative record submitted to this court, the pages of Dr. Corbett's assessment are respectively marked as follows: (1) "Exhibit No. 30F Page 1;" (2) "Exhibit No. 30F Page 2;" (3) "Exhibit No. 30F Page 3;" and (4) "Exhibit No. 30F Page 4." (Admin. R. at 670–73.)

*(2) Weight Accorded to Dr. Corbett's Assessment*

Notwithstanding his contention that the ALJ failed to consider Dr. Corbett's opinion, Plaintiff next contends:

> [T]he ALJ stated he gave "no weight" to the opinions of Dr. Corbett because "[] he does not specify the time periods that the limitations are applicable." [A document submitted to the] Appeals Council . . . clearly state[s] the limitations were present "[] from 03/17/2000 to forward." [sic] . . . This case must be decided or remanded to consider [Dr. Corbett's] opinion of residual functional capacity stated to be applicable from 03/17/2000 to continuing. [sic]

(Pl.'s Br. at 7, 9–14.) I will generously construe Plaintiff's argument as follows: evidence obtained after the hearing renders erroneous the ALJ's decision to discount Dr. Corbett's functional capacity assessment because, in addition to other noted defects, the assessment "does not specify the time period" to which it applies. (*See* Admin. R. at 19.)

"If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. §§ 404.970(b), 416.1470(b) (2007); *see also O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994) ("[N]ew evidence becomes part of the administrative record to be considered when evaluating the Secretary's decision for substantial evidence.").

In the case *sub judice*, Plaintiff sent a letter dated September 21, 2005 to Dr. Corbett, requesting that he clarify whether his functional capacity assessment bore upon the time period for which Plaintiff was seeking disability benefits. (Admin. R. at 689.) The letter also stated: "PLEASE FAX YOUR RESPONSE TO THIS LETTER TODAY." (*Id.*) The hearing took

place on September 23, 2005, and Plaintiff did not present the letter to the ALJ.[6] (*Id.* at 30; *see id.* at 3–4 [identifying medical records received at the hearing].) At the hearing, the ALJ agreed to hold the record open until October 15, 2005 to accept further evidence. (*Id.* at 39.) On November 23, 2005, the ALJ issued an opinion, rejecting Plaintiff's claim — in part because Dr. Corbett's opinion "d[id] not specify the time period [to which] the limitations are applicable." (*Id.* at 19.) In a subsequent letter to the Appeals Council, Plaintiff asserted that Dr. Corbett's letter, as "new and material evidence," constituted grounds for reversal. (*See id.* at 688.)

The Appeals Council disagreed:

> [We] have considered the letter completed by Dr. Corbett . . . . The hearing decision . . . reflects that the [ALJ] evaluated . . . Dr. Corbett's opinions as required by Social Security Ruling 96–2p. The [ALJ] noted that Dr. Corbett's records dated March 1999, April 25, 2000, and June 8, 2000 state you were doing well. On June 26, 2001 you reported you were doing well. The Appeals Council, therefore, finds that the ALJ's evaluation of the medical opinion evidence is supported by substantial evidence.

(*Id.* at 7.) I find that neither the Appeals Council nor the ALJ erred. As set forth below, substantial evidence supports the rejection of Dr. Corbett's opinion that Plaintiff was disabled from March 17, 2000 onward.

First, the letter completed by Dr. Corbett cursorily states that his assessment applies to Plaintiff's capacities from March 2000 onward, but it points to no supporting "medically acceptable clinical and laboratory diagnostic techniques," as is required. *See Watkins v. Barnhart*,

---

[6]Although other faxes in the administrative record that were received by Plaintiff bear the date upon which they were received printed on the top of the page, (*see, e.g.*, Admin. R. at 686), the letter returned from Dr. Corbett has a small chunk torn from it — at precisely the spot where the date of receipt would otherwise be located, (*id.* at 689.)

350 F.3d 1297, 1300 (10th Cir. 2003) (citing Soc. Sec. Rul. 96–2p, 1996 WL 374188, at *2). The functional capacity assessment to which the letter purports to speak is similarly deficient. (*See* Admin. R. at 670–72.) Dr. Corbett failed to answer questions asking him to explain the basis for his determination that Plaintiff had severe postural or manipulative limitations. (*Id.*) More generally, the assessment as a whole is devoid of any statements suggesting it was based on "medically acceptable clinical and laboratory diagnostic techniques." *See Watkins*, 350 F.3d at 1300. Such a poorly supported opinion is not entitled to controlling weight. *See id.*

Second, substantial evidence supports the ALJ's determination that the severe limitations found by Dr. Corbett are inconsistent with the medical record. *See id.* at 1300–01 (stating that treating source opinions not accorded controlling weight must still be weighed according to factors such as their consistency with the record as a whole). As the ALJ noted, Dr. Corbett's own treatment notes from March, April, and June 2000 indicate that while Plaintiff had morning stiffness in her hands and feet and some pain in her knee, she was "looking better," "feeling very well," "spending a lot of time outside," and had "waning" psoriasis. (Admin. R. at 494–95.) When Plaintiff's hepatitis C subsided and she was placed back on her thyroid medicine and methotrexate, Dr. Corbett noted a marked improvement, despite continued morning stiffness. (*Id.* at 492.) From October 2000 through March 2001, Dr. Corbett repeatedly noted that Plaintiff was doing "much better, her "joint symptoms remain[ed] fairly well controlled," and her "arthritis [wa]s well-controlled." (*Id.* at 490–91.) Although Plaintiff complained of pain in her right knee, Dr. Corbett successfully treated it until it was "markedly better with [ninety percent] improvement." (*Id.* at 491.)

Other treating sources' notes paint a similar picture for the period of disability assessed by Dr. Corbett. While Plaintiff complained of various short-lived problems during her interferon treatment, by April 2000 Plaintiff was "feeling great and energetic and [] having no problems." (*See id.* at 120–31.) Furthermore, from March 17, 2000 onward, Plaintiff only once saw Dr. Dernovsek, reporting "that currently her skin [wa]s completely clear." (*Id.* at 250.)

Although Plaintiff accuses the ALJ of "cherry picking" the evidence, I find that a substantial body of evidence supported the ALJ's decision to reject Dr. Corbett's assessment for inconsistency. Even if this court might have come to a different conclusion than did the ALJ, it cannot re-weigh the evidence or substitute its judgment for the ALJ's well-supported opinion. *See Heckler*, 835 F.2d at 1316.

Finally, as the ALJ pointed out, Dr. Corbett's functional capacity assessment was made over four and one-half years after the date last insured. (*Id.* at 19.) As the Commissioner rightly emphasizes, such retrospective diagnoses are insufficient to establish entitlement to social security benefits. *See Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991) ("A retrospective diagnosis without evidence of actual disability is insufficient."). More evidence than that which was presented is required to support a finding of disability.

***(b) Non-Exertional Limitations***

Plaintiff alleges that the ALJ erred in relying on the grids in light of her "significant non-exertional limitations," depression and pain. (Pl.'s Br. at 14–15.) I cannot agree.

The grids relieve the ALJ of the need for vocational expert testimony by establishing through rulemaking the types and numbers of jobs that exist in the national economy. *Heckler v.*

*Campbell*, 461 U.S. 458, 461 (1983).  "Automatic application of the grids is appropriate only when a claimant's RFC, age, work experience, and education precisely match a grid category." *Gossett v. Bowen*, 862 F.2d 802, 806 (10th Cir. 1988) (citations omitted).  RFC, however, primarily measures the claimant's exertional capacity — *i.e.*, her strength.  *Id.* (citation omitted). An individual's capacity to work may also be limited by so-called nonexertional limitations, such as pain.  *Id.* (citation omitted).  Thus, application of the grids without adequate consideration of the claimant's nonexertional limitations constitutes reversible error.  *Id.* (citation omitted). However, "the mere presence of a nonexertional impairment does not automatically preclude reliance on the grids."  *Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993).

 In the instant case, evidence of depression is scant.  (*See* Admin. R. at 131, 492–93.) Moreover, the record demonstrates that Plaintiff's depression responded well to medication.  (*Id.*) In February 1999, Dr. Folan noted Plaintiff had "developed some depression which responded to starting Zoloft."  (*Id.* at 131.)  Although Plaintiff was "tearful" and depressed in an August 2000 interview with Dr. Corbett, in an October 2000 visit, Dr. Corbett noted Plaintiff's "mood swings" were resolved by resuming thyroid supplements.  (*Id.* at 492.)  In April 2000, Dr. Folan told Plaintiff she could stop taking Zoloft.  (*Id.* at 121.)  Substantial evidence reveals Plaintiff's depression was transient and moderate and, thus, cannot render the ALJ's reliance on the grids erroneous.  *See Gossett*, 862 F.2d at 806.

 With respect to Plaintiff's pain, there is substantial evidence that such pain was ongoing. (*See* Admin. R. at 490–504.)  Thus, the ALJ determined that Plaintiff's arthritis constituted a severe impairment, which rendered her unable to do her past relevant work as a long-haul trucker.

(*Id.* at 21–22.) However, the ALJ also determined that Plaintiff's subjective complaints were not fully credible, based both on (1) inconsistencies between her allegations of limitation and the medical evidence, and (2) evidence of her dishonesty — and Plaintiff does not challenge this determination. (*Id.* at 21; *see* Pl.'s Br.) Further, although Plaintiff consistently complained of joint pain to Dr. Corbett, the record consistently reveals that Plaintiff's pain was responsive to medication. (*See, e.g.*, Admin. R. at 490–91 [complaining of knee pain; subsequently reporting ninety percent improvement of knee pain with treatment], 491–93 [complaining of increasing pain; subsequently reporting she was "doing much better" and then "continu[ing] to do well"], 497 [complaining of shoulder pain; subsequently reporting "marked improvement in her shoulder with physical therapy and exercise"]; 499 [complaining of joint pain; subsequently reporting "gradual, but significant improvement"].) Thus, I cannot find that Plaintiff's pain is a sufficiently severe non-exertional impairment to preclude reliance on the grids. *See Glass v. Shalala*, 43 F.3d 1392, 1396 (10th Cir. 1994) (holding that where substantial evidence supports ALJ's decision to disregard claimant's testimony concerning extent of nonexertional impairments, it is not error to apply grids).

***4. Conclusion***

Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is AFFIRMED.

Dated this 20th day of September, 2007.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge